11-3806-cr
United States v. Ferguson

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: September 21, 2012                    Decided: December 6, 2012)

Docket No. 11-3806-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

LAMONT FERGUSON,

*Defendant-Appellant*.

_____

B e f o r e :

LEVAL, CABRANES, and KATZMANN, *Circuit Judges*.

_____

Appeal from a judgment of conviction entered by the United States District Court for the

Southern District of New York (Swain, *J.*) on September 13, 2011, following a one-day bench

trial on stipulated facts. We hold that, notwithstanding the fact that police officers interrogated

Ferguson an hour or more after his arrest, the realistic possibility that Ferguson had left a firearm

in a public place created an objectively reasonable need for officers to protect the public safety,

and thus allowed the officers to act under the "public safety" exception to the requirement that they inform Ferguson of his *Miranda* rights. For the reasons stated below, the judgment of the district court is **AFFIRMED**.

———————————

MICHAEL HURWITZ, ESQ., Hurwitz Stampur & Roth, New York, N.Y., *for Defendant-Appellant*.

ELISHA J. KOBRE, (Iris Lan, *on the brief*), Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, N.Y., *for Appellee*.

———————————

KATZMANN, *Circuit Judge*:

This case requires us to determine whether the "public safety" exception to the requirement of *Miranda* warnings—an exception that the United States Supreme Court first recognized in *New York v. Quarles*, 467 U.S. 649, 655–56 (1984)—applies where police officers have reason to believe that a suspect may have left a gun in a public place, but where interrogation occurs an hour or more after the suspect's arrest. Defendant-Appellant Lamont Ferguson appeals from a judgment of conviction entered on September 13, 2011 in the United States District Court for the Southern District of New York (Swain, *J.*) after a one-day bench trial. For the reasons set forth below, principally that police officers had an immediate and objectively reasonable need to protect the public from a realistic threat, we hold that the "public safety" exception applies, and thus we affirm Ferguson's conviction.

2

A.        Ferguson's Arrest and Interrogation

On the evening of July 21, 2010, Ferguson had a verbal and physical altercation with two women. When Ferguson left the place where the altercation had begun, the two women followed him. After one woman threatened Ferguson with a bottle, he brandished a pistol and fired it into the air, hoping to scare the women away. At approximately 10:10 PM, someone called 911 and informed police officers that an individual named "Lamot" had fired two shots in the vicinity of West 228th Street in the Bronx, New York. During the 911 call, the operator learned that "Lamot" lived at 125 West 228th Street on the twelfth floor.

At approximately 11:00 PM, while Ferguson was standing in front of his apartment building on West 228th Street, two police officers approached him and asked him if his name was "Lamont." When he indicated that it was, the officers arrested him and took him to the 50th Police Precinct. At the precinct, Ferguson was questioned by Sergeant Ian Rule, in the manner described below, without previously being given *Miranda* warnings. After interrogation, Ferguson led officers to his sister's apartment—on the seventh floor of 125 West 228th Street—where they recovered a pistol. Upon returning to 50th Precinct, officers informed Ferguson, for the first time, of his *Miranda* rights under the Fifth Amendment. Ferguson then gave a written statement in which he admitted to possessing and firing the pistol that the officers had recovered.

On September 20, 2010, the Grand Jury issued a one-count indictment charging Ferguson with possessing a firearm, after conviction of a felony, in violation of 18 U.S.C. § 922(g)(1). Ferguson moved to suppress all inculpatory evidence on the ground that police officers had

obtained it by questioning him in violation of his rights under the Fifth Amendment. *See*

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966). On January 26, 2011, the district court held an

evidentiary hearing to assess the factual claims on which Ferguson based his motion. At the

hearing, Ferguson did not call any witnesses, and the government relied exclusively on the

testimony of Sergeant Rule.

Sergeant Rule testified that, on the evening of July 21, 2010, he was working in the 50th

Precinct as a Field Intelligence Officer. According to Sergeant Rule, Field Intelligence Officers

gather intelligence about criminal activity from arrestees, but generally do not try to develop the

evidence necessary to prosecute the arrestees whom they question. During his shift on July 21,

2010, Sergeant Rule read a transcription of the 911 call that reported that "Lamot" had fired two

shots near West 228th Street. Several months earlier, Sergeant Rule had received information that

an individual named Lamont, who lived at 125 West 228th Street on the twelfth floor, possessed

and had access to firearms. After consulting an arresting officer, Sergeant Rule learned that

officers had not recovered the weapon Ferguson reportedly had fired when they arrested him

earlier on the evening of July 21 in connection with the 911 call.

Sergeant Rule testified that, based on reports of the arrest and the prior information he

had received about Ferguson, he began to feel:

> a sense of urgency because . . . it became more clear to me that there was a
> firearm possibly out there that we did not – didn't know where it was and the
> location where this incident happened, 125 West 228, or right across the street
> from it, it's in very close proximity to a playground and ball fields and also
> there's a church across the street, so I felt that possibly the weapon could have
> been out there for anyone to get, to grab, maybe a child or some kid or something
> like that, so I wanted to make sure that we could try and find out where this gun
> was as soon as possible.

4

App'x at 112–13. Concerned with the recovery of the gun, Sergeant Rule began to interrogate Ferguson. Because Sergeant Rule "was trying to find out the location of the firearm," he did not inform Ferguson of his Fifth Amendment rights. *Id.* at 115. Sergeant Rule testified that he "felt that if [he] had given *Miranda* warnings, it might have . . . scared [Ferguson] where he wouldn't tell [him] where the gun was." *Id.*

During the interrogation, Sergeant Rule explained to Ferguson "that it was very important that if there was gun out there, that [the officers] were able to find it before someone else – before someone got hurt." *Id.* at 119–20. While Sergeant Rule told Ferguson that "cooperation would always be looked at in his favor," *id.* at 121, he made no promises, instead clarifying that prosecutors would make "the ultimate decision," *id.* at 124. Sergeant Rule interrogated Ferguson for approximately thirty to forty-five minutes. Eventually, Ferguson agreed to accompany officers back to his apartment building. The officers left the 50th Precinct with Ferguson to recover the gun at around 1:00 AM on the morning of July 22, 2010. Ferguson led officers to his sister's apartment on the seventh floor, where they recovered the gun.

B.      The District Court's Decision

The district court, considering Sergeant Rule's testimony as well as an affidavit submitted by Ferguson, found that: (1) Ferguson's "arrest was prompted by a 911 call reporting that an individual named Lamont had been involved in an altercation with two women in which gunshots had been fired"; (2) "Sgt. Rule learned . . . from a 'SPRINT report' generated by a 911 call . . . that gunshots were reported to have been fired during the altercation"; (3) "Sgt. Rule had prior knowledge that there was an individual named Lamont who resided in the vicinity of where the shots were reportedly fired who was said to be in possession of and to have access to

5

firearms"; (4) "[t]he arresting officer also informed Sgt. Rule that no gun had been recovered in connection with Ferguson's arrest"; (5) "the reported altercation had occurred outdoors, near playgrounds, athletic fields and a church"; and (6) "Sgt. Rule was concerned and felt a sense of urgency regarding a potential threat to public safety posed by the possibility that the gun could be found by a child or other member of the general public." *United States v. Ferguson*, No. 10 Cr. 843 (LTS), 2011 WL 1347002, at *1 (S.D.N.Y. Apr. 4, 2011). The district court also found that, as described by Sergeant Rule and by Ferguson in his declaration, the "content and scope of [Sergeant Rule's] questioning . . . was rationally related to the objective of securing public safety by locating the gun." *Id.* at *6.

Having made these findings, the district court denied Ferguson's motion to suppress both his inculpatory statements and the gun that officers had recovered with his assistance. The district court held that, although Sergeant Rule had not warned Ferguson about his Fifth Amendment rights, his questioning fell "within the scope of the public safety exemption" to the requirement of such warnings. *Id.* at *3–*6; *see also New York v. Quarles*, 467 U.S. at 655–56. Specifically, the district court held that "[t]he report of an unaccounted-for, recently-fired gun certainly provided objectively reasonable grounds for concern on the part of the police as to public safety." *Ferguson*, 2011 WL 1347002, at *6. In reaching this conclusion, the district court rejected Ferguson's counsel's argument that the public-safety exception did not apply because "some hours" had elapsed between Ferguson's arrest and his interrogation by Sergeant Rule. *Id.* The district court reasoned that the passage of time did not "mean that the danger to the public posed by a loose firearm had dissipated such that the weapon ceased to pose an immediate threat to the public." *Id.*

6

After the district court admitted the evidence in question, the parties consented to a bench trial, which the district court held on May 12, 2011. The parties stipulated to the following facts: (1) that Ferguson had knowingly possessed a firearm on July 21, 2010; (2) that he had previously been convicted of attempted robbery in the second degree; and (3) that the firearm Ferguson had possessed had previously traveled in interstate commerce. Based on these undisputed facts, the district court found that Ferguson had violated 18 U.S.C. § 922(g)(1) by possessing a firearm after having been convicted of a felony. On September 8, 2011, the district court sentenced Ferguson, principally, to a term of imprisonment equal to the approximately 12 months he had already served and to three years of supervised release. Ferguson filed a timely notice of appeal on September 20, 2011.

## DISCUSSION

"When considering a challenge to the resolution of a suppression motion, we review findings of fact for clear error and legal questions *de novo*." *United States v. Stewart*, 551 F.3d 187, 190-91 (2d Cir. 2009). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Sash*, 396 F.3d 515, 521 (2d Cir. 2005) (quotation marks omitted). When we review the denial of a suppression motion, we view the evidence in the light most favorable to the government and draw all reasonable inferences in the government's favor. *See United States v. Singh*, 415 F.3d 288, 293 (2d Cir. 2005).

The Fifth Amendment to the Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "Although statements made by a suspect in custody in response to police interrogation are typically inadmissible unless preceded by *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S.

7

436, 467–68 (1966), the Supreme Court has recognized a 'public safety' exception to that rule."

*United States v. Estrada*, 430 F.3d 606, 610 (2d Cir. 2005) (citing *Quarles*, 467 U.S. at 655–59).

Under this exception, "overriding considerations of public safety [may] justify [an] officer's

failure to provide *Miranda* warnings before he ask[s] questions devoted to locating [an]

abandoned weapon." *Quarles*, 467 U.S. at 651. As the Supreme Court has explained, "if the

police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the

gun, suspects . . . might well be deterred from responding." *Id.* at 657. Because such deterrence

would potentially threaten public safety, "the need for the prophylactic rule protecting the Fifth

Amendment's privilege against self-incrimination" is overcome by "the need for answers to

questions." *Id.*

In *Quarles*, a young woman told police that a man, carrying a gun, had just raped her. *Id.*

at 651–52. The officers located the suspect in a supermarket and, after arresting and frisking him,

discovered that he was wearing an empty shoulder holster. *Id.* at 652. The officers asked the

suspect where his gun was. *Id.* He nodded in the direction of some empty cartons, and said, "the

gun is over there." *Id.* The officers then discovered a loaded revolver. *Id.* The Supreme Court

held that *Miranda* did not require the suppression of the statement disclosing the location of the

gun, reasoning that "[s]o long as the gun was concealed somewhere in the supermarket, with its

actual whereabouts unknown, it obviously posed more than one danger to the public safety: an

accomplice might make use of it, a customer or employee might later come upon it." *Id.* at 657.

We have recently addressed the scope of the public safety exception in *United States v.*

*Estrada*. 430 F.3d at 610. In *Estrada*, law enforcement officers went to the defendant's home to

execute an arrest warrant. *Id.* at 608. The officers knew that the defendant had two prior assault

convictions and, before arriving at the defendant's home, they learned from a confidential

8

informant that the defendant kept drugs there. *Id.* at 608, 613. While officers arrested the defendant, one officer asked whether there were any weapons in the apartment. *Id.* at 608–09. In response, the defendant indicated that there was a gun in the pocket of a jacket that lay on a nearby chair. *Id.* at 608. We affirmed the district court's denial of the defendant's motion to suppress both his statement and the firearm. *Id.* at 613. Specifically, we held that, in light of the defendant's prior assault convictions and the information officers had received about his possession of drugs, the officers had "an objectively reasonable need to protect themselves from immediate danger." *Id.* Thus, the public safety exception applied to their questions. *Id.*

In *Estrada*, we found three factors persuasive in upholding the denial of the motion to suppress on the basis of the public safety exception. First, the questioning without *Miranda* warnings related to an "*objectively* reasonable need to protect the police or the public from any immediate danger." *Id.* at 612 (internal quotation marks omitted). Second, the objective facts did not suggest that the questioning was "a subterfuge," *id.* at 613, "designed solely to elicit testimonial evidence from a suspect," *id.* at 612, but instead that the questioning was generally targeted at a safety concern, *id.* at 613. Finally, the questions were not routinely put to arrested suspects, *id.* at 612, but rather were supported "by an objectively reasonable need to protect" against a perceived danger, *id.* at 613.

The public safety exception, as explained in *Quarles* and *Estrada*, applies to Sergeant Rule's interrogation of Ferguson. The altercation reported in the 911 call had occurred outside, as had Ferguson's arrest. Sergeant Rule had previously heard that Ferguson possessed a firearm. Moreover, while Ferguson had reportedly discharged a firearm during the altercation described in the 911 call, the officers had not found any firearm when they arrested him. Not knowing where Ferguson had gone between the altercation and the arrest—or if he had gone

9

anywhere—the officers confronted the realistic and disquieting possibility that he had hidden a firearm in public. In light of that realistic possibility, Sergeant Rule had "an objectively reasonable need to protect . . . the public from immediate harm." *Id.* at 614. Ferguson's apartment building abutted a playground and athletic fields. Had he hidden his firearm there, or even just in the vicinity of his large, residential building, the consequences could have been devastating. As the Supreme Court observed in *Quarles*, "[s]o long as the gun was concealed somewhere[,] . . . with its actual whereabouts unknown, it obviously posed more than one danger to the public safety." 467 U.S. at 657.

Moreover, Sergeant Rule's questioning was not "investigatory in nature" or framed in such a way as to reveal a design "solely to elicit testimonial evidence." *Estrada*, 430 F.3d at 612 (internal quotation marks omitted). As the district court found, "[t]he content and scope of the questioning . . . was rationally related to the objective of securing public safety by locating the gun." *Ferguson*, 2011 WL 1347002, at *6. Indeed, Ferguson stated in his affidavit that the officers "warned [him] that guns are extremely dangerous, and that they needed to know where the gun was located." App'x at 21. Such questioning "plainly encompasses safety concerns." *Estrada*, 430 F.3d at 612. Furthermore, even if some of Sergeant Rule's questions had been "broad enough to elicit other information," the public safety exception would still apply because the context in which the officers acted "ma[de] clear that the question[s] primarily involve[d] safety." *Id.* Thus, the questioning at issue here conforms to the limitation we recognized in *Estrada*.

Finally, the surrounding facts demonstrate that the questioning was not a subterfuge for routine interrogation of arrested suspects without *Miranda* warnings, but instead was supported by the safety concern. Nor will holding that the public safety exception applies to this

questioning result in routine questioning of suspects without *Miranda* warnings. *See id.* At least three factors differentiate the questioning at issue here from a "routine" interrogation. First, the report that Ferguson had fired the weapon informed officers that the gun functioned, that it was loaded, and that the altercation had escalated to a point where Ferguson had, at the very least, threatened to use deadly force. Each piece of information increased the probability that recovery of the gun by an accomplice or a third party would threaten the public safety. Second, the fact that all reported events had occurred outside, combined with the fact that officers had not recovered a gun when they arrested Ferguson, indicated that he had potentially hidden the gun in a public space. Third, Sergeant Rule had previously received information that corroborated the report that Ferguson had possessed a firearm. These factors, taken together, created an objectively reasonable need for officers to protect the public from the realistic possibility that Ferguson, having possessed a dangerous weapon as little as an hour before his arrest, had hidden that weapon in a public place. Thus, these factors differentiate this case from numerous others in which pre-*Miranda* questioning would not be permitted.[1]

Resisting the application of the public safety exception, Ferguson argues that prior cases have applied that exception only where officers have questioned a suspect about the location of a gun *during* the course of an arrest. While Ferguson is correct that prior cases have all considered such situations, the reasoning set forth in those cases applies equally here. In *Quarles*, the

---

[1]Ferguson argues that officers will rarely know where an arrestee has hidden the weapon that he allegedly possessed, making this case routine. This argument, however, ignores two pieces of information, known to the officers, that substantially increased the possibility that Ferguson had hidden his gun outside. First, officers arrested Ferguson roughly an hour after he fired the weapon in question. Second, they arrested him outside, near where the altercation had occurred. Because officers knew that Ferguson had only a short amount of time and may not have moved far during that time, their basis for believing that Ferguson had left a weapon in a dangerous place was stronger than that of officers who simply do not know where a suspect may have left a weapon.

11

Supreme Court observed that, "[s]o long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety." 467 U.S. at 649. While we recognized in *Estrada* that the public safety exception also encompasses cases in which officers feel concerned about their own well-being, 430 F.3d at 613, this inclusion did not alter the exception's application to questioning that promotes the public's safety, *id.* Because the exception prioritizes "overriding considerations of public safety," *Quarles*, 467 U.S. at 651, its application cannot depend solely on the timing of interrogation. As the district court astutely observed, the fact that "some hours had passed after Ferguson's arrest does not . . . mean that the danger to the public posed by a loose firearm had dissipated such that the weapon ceased to pose an immediate threat to the public." *Ferguson*, 2011 WL 1347002, at *6.

We recognize that, in certain circumstances, the passage of time between an arrest and an interrogation, among other considerations, may diminish the immediacy of the threat posed by an unaccounted-for firearm. Nonetheless, because this case clearly falls within the public safety exception, and because the immediacy of threats to public safety is highly context-dependent, we need not speculate about when that exception would not apply. *See Estrada*, 430 F.3d at 616 ("[T]he public safety exception [is] a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case." (internal quotation marks omitted)). Here, officers received the 911 call at 10:10 PM. They arrested Ferguson at approximately 11:00 PM. Sergeant Rule testified that he interrogated Ferguson for thirty to forty-five minutes and that officers left with Ferguson to recover the gun at around 1:00 AM on the morning of July 22, 2010. Thus, the interrogation occurred approximately an hour to an hour and a half after Ferguson's arrest, and approximately two to two and a half

hours after Ferguson fired the gun in question.[2] These brief amounts of time did not diminish the officers' objectively reasonable need to protect the public from the realistic possibility that Ferguson had hidden his gun in public, creating an imminent threat to public safety. Thus, the public safety exception applies.

## CONCLUSION

In sum, we hold that, because officers had an objectively reasonable need to protect the public from the realistic possibility that Ferguson had recently left a gun in a public place, they could act under the public safety exception when questioning Ferguson an hour or more after his arrest. Our analysis applies equally to Ferguson's motion to suppress his inculpatory statements and to his motion to suppress the physical evidence that he subsequently helped officers recover. Accordingly, the district court's judgment is **AFFIRMED**.

---

[2]In fact, because Sergeant Rule testified that he spent a half hour to forty-five minutes gathering officers for the trip to recover the gun, the interrogation may have begun as early as thirty minutes after Ferguson's arrest.